642 A.2d 317

**MARYLAND INDUSTRIAL FINISHING CO., INC.**

v.

**CITIZENS BANK OF MARYLAND.**

**No. 1516, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

June 9, 1994.

---

William O. Lockwood, Greenbelt, for appellant.

Steven J. Parrott (Nancy E. Leibowitz and Hartman and Parrott, on the brief), Annapolis, for appellee.

Argued before WILNER, C.J., and ALPERT and WENNER, JJ.

ALPERT, Judge.

This case of first impression requires us to construe § 3–419 of the Annotated Code of Maryland, Commercial Law Article (1992 & Supp.1993) (hereinafter "CL") and decide whether an unauthorized endorsement is a "forged indorsement" within CL § 3–419(1)(c).

Appellant, Maryland Industrial Finishing Co., Inc., (MIFCO) is a Maryland corporation and maintains its principal place of business in Prince George's County.[1] MIFCO maintained two bank accounts with Citizens Bank of Maryland ("Citizens").[2] Pauline Pagani ("Mrs. Pagani") was employed by MIFCO as a bookkeeper beginning April 13, 1989, through February 23, 1990. Mrs. Pagani's job description included preparing time cards, filing, invoicing, answering the phone, and doing the bank deposits. Specifically, Ms. Alexander

---

1. Brenda Alexander and her husband Mr. Alexander are the owners of MIFCO.

2. Account number 048–0385 (operating account) and 085–1718 (payroll account) (E 50).

testified that Mrs. Pagani was instructed to "pull the pink paper [MIFCO's copy of the invoice] ... mark it paid with the check number, and the date on it, then stamp the back of the check with the Maryland Industrial Finishing stamp, with the address and phone number, and also to use the for deposit only [stamp], and make up the deposit slip." [3]

Beginning around June 23, 1989, Mrs. Pagani started depositing checks made out to MIFCO into checking account number 353–7219 at Citizens (this account was titled in both Mr. and Mrs. Pagani's names). At trial, Mrs. Pagani noted that almost "90 percent" of the time she used a drive-thru window to make the deposits. Mrs. Pagani undertook this deception by first typing "MIFCO" onto a blank deposit slip upon which she wrote her own account number. She then endorsed the checks with MIFCO's stamp and submitted the "MIFCO" deposit slip with the check for deposit to her account with Citizens. Apparently, Citizens failed to detect this scheme. Mrs. Pagani along with her husband, Michael Pagani, allegedly utilized the embezzled funds to pay for their household, automobile, insurance expenses, and a vacation to Florida. Ms. Alexander discovered the defalcation sometime in February, 1990. MIFCO then brought an action against Citizens and Mr. and Mrs. Pagani alleging negligence, conversion, unjust enrichment, and constructive trust. Judgment was entered against Mrs. Pagani in the amount of $35,683.70 in compensatory damages and $10,000.00 in punitive damages.[4] Citizens made a motion for judgment, which the trial court granted.

On appeal, MIFCO asks us the following questions:

1. Did the trial court err in not finding a conversion?

2. Did the trial court err in requiring expert testimony from the plaintiff?

---

3. Mrs. Pagani's testimony on this issue reflected that of Mrs. Alexander.

4. This was done via a motion for summary judgment against Mrs. Pagani. (e 201, 217–20)

3. Should the trial court have awarded pre-judgment interest?

### Scope of Review

In the instant case, Citizens' motion for judgment was granted at the conclusion of the appellant's case. In *Pahanish v. Western Trails, Inc.,* 69 Md.App. 342, 353, 517 A.2d 1122 (1986), we stated that

> [i]n a *non-jury* trial, when a party has moved for judgment, the court is allowed as trier of fact to determine the facts and render judgment thereon. The trial judge is not compelled to make any evidentiary inferences whatsoever in favor of the party against whom the motion for judgment is made.

(Emphasis in the original). *See* Md. Rule 2–519(b) (1994). In the case sub judice, however, the trial court granted the motion for judgment because it did not agree with MIFCO's assertion that Mrs. Pagani's unauthorized indorsement was the functional equivalent of a "forged indorsement" under CL § 3–419(1)(c). Accordingly, we review the trial court's judgment to ascertain whether it was legally correct.

1. *Conversion Issue*

Appellant asserts that the trial court erred in granting Citizens' motion for judgment because an "unauthorized indorsement *is* a forged indorsement." Citizens agrees with the proposition that to sustain a claim for conversion, it must be demonstrated that it paid checks with "forged indorsements." *See* CL § 3–419(1)(c). Citizens, however, posits that we do not need to address the issue of whether an instrument is converted when it is paid on an unauthorized endorsement because Mrs. Pagani had the authority to endorse the instruments.

a. **Background**

■ It is axiomatic that a payee whose signature is forged can successfully maintain a conversion action against the drawee (bank) for paying funds upon that forged endorsement.

*Mid–Atlantic Tennis Cts. v. Citizens Bank & Trust Co.*, 658 F.Supp. 140, 143 (D.Md.1987). We, thus, clarify that this is not a contract action. Our analysis is focused solely on the tort of conversion. *See Levin v. Union Nat'l Bank*, 224 Md. 603, 607, 168 A.2d 889 (1961) ("The cases also recognize that the payee whose signature is forged would have a conversion action against the drawee, but not a contract action, for paying funds upon an instrument bearing his forged indorsement.")

The Court of Appeals explained the tort of conversion in *National Union Bank v. Miller Rubber Co.*, 148 Md. 449, 457, 129 A. 688 (1925) as follows:

"If a negotiable instrument having a forged indorsement come to the hands of a bank and is collected by it, the proceeds are held for the rightful owners of the paper, and may be recovered from them, although the bank gave value for the paper, or has paid over the proceeds to the party depositing the instrument for collection." [5]

Currently, conversion is defined at CL § 3–419(1)(c), (3) as follows:

(1) An instrument is converted when

\* \* \* \* \* \*

(c) It is paid on a forged indorsement

\* \* \* \* \* \*

---

**5.** In *Modern Homes Construction Co. v. Tryon Bank and Trust Co.*, 266 N.C. 648, 147 S.E.2d 37, 41 (1966), the Supreme Court of North Carolina explained conversion as follows:

When the drawee bank takes a check without the payee's endorsement, delivers cash in the amount of the check to one unauthorized tò receive its payment, and ultimately returns the check to the maker, the bank has assumed complete control over the check, dealt with it as its own, and withheld it from its rightful owner. Such dealings constitute a.tortious conversion of the check, and the payee is entitled to recover its value.

(Citations omitted). *See also* William D. Hawkland & Lary Lawrence, 4 *Uniform Commercial Code Series*, § 3–419:01, 942 ("An owner of personal property has the right to enjoy its undisturbed possession. This right extends to the owner of a negotiable instrument. Whenever an owner's right to possession of an instrument is seriously interfered with, the owner has a cause of action in tort for conversion against the person causing the interference.")

(3) Subject to the provisions of Titles 1 through 10 of this article concerning restrictive indorsements a representative, including a depositary or collecting bank, who has in good faith and in accordance with the reasonable commercial standards applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in his hands.

*But see C.S. Bowen Co. v. Maryland Nat'l Bank*, 36 Md.App. 26, 37–38, 373 A.2d 30 (1977) (listing several defenses available in a conversion action).

MIFCO asserts that the evidence presented during the trial established that Mrs. Pagani endorsed "checks made payable to MIFCO with a rubber stamp provided to her and then put her own account number on the check and deposited the checks in her own account at Citizens." MIFCO explains that Mrs. Pagani's duties included making bank deposits into MIFCO accounts by endorsing the checks with the MIFCO stamp, that contained MIFCO's address and phone number, and a "for deposit only" stamp. Mrs. Alexander specifically testified that Mrs. Pagani was instructed to use both the stamps and then make the deposits into MIFCO accounts.

The trial court specifically found that Mrs. Pagani's actions were not a forgery because she was authorized to endorse the checks with the MIFCO stamp. In so concluding, the court summarized its understanding of the case as follows:

[T]he number of the account was only put on the deposit slip. If the procedure used was to put the number of the account on the check as part of the signature, and that number somehow was modified, or altered, or changed or something, you might have an argument. But that was never on the check. All that ever showed on the check was, one, *the name of the company, which was used as the endorsement*, and two, for deposit only.

(Emphasis added). We conclude that the trial court erred in its analysis and explain.

### b. Other jurisdictions

In *Matco Tools Corp. v. Pontiac State Bank*, 614 F.Supp. 1059 (E.D.Mich.1985) the court addressed whether a payee of a negotiable instrument could bring an action against the depository bank for accepting the instrument over an unauthorized endorsement. On the issue of the endorsement, the Court noted that

> [t]he parties seriously dispute whether any endorsement on the check can be considered "forged." Matco clearly gave Cox authority to endorse checks from customers. Travelers, however, was not a customer of Cox. [U.C.C.] Section 3–401(2) provides:
>
>> A signature is made by use of any name, including any trade name or assumed name, upon an instrument, or by any word or mark used in lieu of a written signature.
>
> Here, the check bore an endorsement stamp bearing the words "Matco Tools." This suffices as Matco's signature under section 3–401(2). Section 1–201(43) defines an unauthorized signature to mean "one made without actual, implied or apparent authority and includes a forgery." Conversely, a signature which is authorized is not a forgery. It is clear that Cox had no express authority to endorse the check on behalf of Matco because Travelers, the drawer of the check, was not a customer of Cox.

*Id.* at 1062 (citations omitted). The Court then effectively concluded that the bank had converted the instrument because it "deposited the check in the account of DMC Enterprises over the unauthorized endorsement of Matco." *Id.* The Court further opined that the bank's assertion that "nothing on the face of the check put it on notice that Cox was acting beyond the scope of his authority" was relevant to the issue of whether it had acted in a commercially reasonable manner. *Id.*

■ Numerous other jurisdictions have held that the term "forgery," [6] in their respective equivalent of CL § 3–419, is applicable to unauthorized endorsements.[7] *See generally, Equitable Life Assur. Soc. of U.S. v. Okey,* 812 F.2d 906, 908 (4th Cir.1987) ("an action for conversion lies when an instrument is paid on a forged indorsement. An unauthorized indorsement receives the same treatment as a forgery."); *D & G Equip-*

---

6. In the criminal law arena, forgery is "comprised of essentially three elements. First, there must be a writing which is the proper subject of forgery. Secondly, this writing must be false. Finally, the writing must have been rendered false with intent to defraud." *State v. Reese,* 283 Md. 86, 90, 388 A.2d 122 (1978). *See also* Article 27, § 44(a) (1957, 1992 Repl.Vol. & Supp.1993).

7. The Code does not define "forgery." Instead, it explains what an unauthorized signature or indorsement is as "one made without actual, implied or apparent authority and includes a forgery." CL § 1–201(43). Professor Thomas M. Quinn explains:

"Forged" is a term in common use and carries a familiar content. The law on forgeries is contained, in part, in the Code. What may come as a surprise to many, however, is that the Code uses the term "forged" only rarely. The preferred Code terminology is "unauthorized signature." The ugly reality of forgery, if you will, is clothed in singularly neutral terminology.

There is a reason for the change. The term "unauthorized signature" includes not only the crude forgery commonly associated with one who, for example steals and signs a check but also a wide range of other signings. Thus, even where there has been no theft and where the signing is well intentioned, it may still be "unauthorized." The term "unauthorized signature," to quote the drafters, "includes both a forgery and a signature made by an agent exceeding his actual or apparent authority." (Official Comment No. 1 to 3–404.) The effect of either type of signing, however, is the same. Thus, whether the signature affixed is a rank forgery of the grossest sort or merely an agent's signing without adequate authority, the unauthorized signature is "wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it. . . ." (3–404(1).) Both types of signings, therefore, are equally valueless as the signature of the named party.

The importance of this information lies in the fact that the rules that apply to "unauthorized signatures" normally operate in the same way for both types of signings. The point bears emphasis, since it is likely to be at variance with the common misconception that a crude forgery is so different from the signing by an agent without authority that the applicable legal rules, even under the Code, must be miles apart. [19 UCCLL 7 (Sept. 1985).] They aren't.

Thomas M. Quinn, *1 Quinn's Uniform Commercial Code Commentary and Law Digest,* § 3–404[A][2], 3–184 (2d ed. 1991).

*ment v. First Nat'l Bank of Greencastle, PA.,* 764 F.2d 950, 955 (3d Cir.1985) (interpreting the Pennsylvania equivalent of CL § 3–419(1)(c) as follows "[a]lthough by its terms this section would seem to require an actual forgery as a precondition to liability, section 3–419 has been generally interpreted to impose liability when an instrument is paid upon an unauthorized indorsement as well."); *Oswald Machine & Equip., Inc. v. Yip,* 10 Cal.App. 4th 1238, 1243–44, 13 Cal.Rptr.2d 193 (1992) (holding that the conversion provisions relating to forged endorsements are also applicable to unauthorized endorsements); *Fort Dodge Creamery Co. v. Commercial State Bank,* 417 N.W.2d 245, 246 (Iowa App.1987) (concluding that for purposes of a conversion action, forged endorsement and an unauthorized endorsement are synonymous); *Levy v. First Pennsylvania Bank N.A.,* 338 Pa.Super. 73, 487 A.2d 857, 860–61 (1985) (noting that an unauthorized signature is the same as a "forgery" for purposes of an action for conversion under the U.C.C.); *Confederate Welding v. Bank of the Mid–South* 458 So.2d 1370, 1373–74 (La.App.1984) (explaining that an unauthorized endorsement is a "forged endorsement"); *Aetna Cas. & Sur. Co. v. Hepler State Bank,* 6 Kan.App.2d 543, 630 P.2d 721, 723, 725–26 (1981) ("There is no substantial difference between an unauthorized indorsement and a forged indorsement, the result being the same insofar as concerns the passing of title."); *Equipment Distrib. v. Charter Oak Bank, etc.,* 34 Conn.Supp. 606, 379 A.2d 682, 684 (Conn.Super.Ct.1977) (holding that "collection of the proceeds of [a] check based on an unauthorized endorsement constituted a conversion"); *Hartford Accident and Indemnity Co. v. South Windsor Bank and Trust Co.,* 171 Conn. 63, 368 A.2d 76, 79–80 (1976) ("An unauthorized signature, one made without actual, implied or apparent authority and including a forgery, is inoperative as that of the person whose name is signed. The unauthorized signature in this case may not constitute a forgery in the strict sense, but the use of the term 'forged endorsement' . . . does not preclude the finding of a conversion."); *Salsman v. National Community Bank of Ruther-*

*ford,* 102 N.J.Super. 482, 246 A.2d 162, 167–68 (Law Div.1968), ("There is no substantial difference between an unauthorized endorsement and a forged endorsement, the result being the same in so far as concerns the passing of title."), *affirmed* 105 N.J.Super. 164, 251 A.2d 460 (1969). *See also* 6A Anderson, *Uniform Commercial Code,* § 3–419:71, p 126–27 (3d ed. 1993) ("Payment on an unauthorized indorsement is a conversion as there is no distinction between a forged indorsement and one made without authorization"). *Accord Payee's Right Of Recovery, In Conversion Under UCC § 3–419(1)(c), For Money Paid On Unauthorized Indorsement,* 23 A.L.R.4th 855 (1983 & Supp.1993); *Right of check owner to recover against one cashing it on forged or unauthorized indorsement and procuring payment by drawee,* 100 A.L.R.2d 670 (1965 & Supp. 1993, 1994). *Contra, Jones v. Van Norman,* 513 Pa. 572, 522 A.2d 503, 507 (1987). Thus, as in the case of a forgery, when a bank accepts an instrument with an unauthorized endorsement, it has exercised "dominion and control over the instrument inconsistent with the rights of the owner, and results in liability for conversion." 2A *West's Unif. Laws Ann.,* Unif. Comm.Code, Off. com. 3 to § 3–419, p. 341 (1991).

We find the reasoning of these cases and other authorities to be persuasive on this point and conclude that CL § 3–419(1)(c) is applicable in instances of unauthorized endorsement. CL § 3–202(1) explains that an instrument [8] is negotiated by "the transfer of an instrument in such form that the transferee becomes a holder. If the instrument is payable to order it is negotiated by delivery with any necessary indorsement." Thus, a check drawn to the order of the payee, MIFCO, may not be negotiated without the payee's indorsement. A holder is one who receives an instrument that is "issued or indorsed to him or his order" or in blank. CL § 1–201(20). Citizens cannot be a holder or holder in due course, CL § 3–302, without MIFCO's valid indorsement. An unau-

---

8. CL § 3–102(e) defines an instrument as a negotiable instrument.

thorized signature (or indorsement)[9] by a forger does not operate as the true payee's signature because CL § 3–404(1) provides "[a]ny unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it." In William D. Hawkland & Lary Lawrence, 4 *Uniform Commercial Code Series*, § 3–404:01, 633–37, the authors explain that an "unauthorized indorsement will not operate to negotiate the instrument." (footnotes omitted). Thus, the transferee of an instrument with a forged or unauthorized indorsement (i.e., Citizens) does not become a holder or a holder in due course because there can be no negotiation of an instrument with an unauthorized signature. Only a holder or her agent may properly present the instrument for payment. CL § 3–504(1). CL § 4–401 states that a "bank may charge [a customer] . . . any item which is otherwise *properly payable.*" (Emphasis added). White and Summers, 1 *Uniform Commercial Code*, § 15–3, 751–52 (3rd ed. 1988), explain that "section 4–401 authorizes the drawee bank to charge to its customer's account items 'properly payable' and by negative implication denies the drawee bank the right to charge amounts not properly payable." They further explain that "[i]n the case of an order instrument, forgery precludes negotiation, so that no subsequent transferee can be a holder under Article Three; accordingly, no payment can be proper since only a holder can make proper presentment and receive payment."[10] *Id.* at 879 (footnotes omitted). Thus, the key issue in this case is the extent of Mrs. Pagani's authority because "[a]n unauthorized signa-

---

**9.** CL § 1–201(43) defines an unauthorized signature or indorsement as "one made without actual, implied or apparent authority and includes a forgery."

**10.** Additionally, we note that CL § 3–204(2) provides that "[a]n instrument payable to order and indorsed in blank becomes payable to bearer and may be negotiated by delivery alone." Thus, when Mrs. Pagani indorsed the checks with the stamp containing MIFCO's name and address, the order paper (i.e., payable to the order of MIFCO) was altered into a bearer instrument because the stamp acted as MIFCO's corporate signature. *See* CL § 3–401. *See also Matco Tools Co.,* 614 F.Supp. at 1062.

ture may be a forgery or a signature by an agent in excess of his actual or apparent authority. No distinction is made between forgeries and unauthorized signatures by agents." William D. Hawkland & Lary Lawrence, 4 *Uniform Commercial Code Series*, § 3–404:01, 633 (footnotes omitted). We now turn to ascertain the scope of Mrs. Pagani's authority.

### c. **Authority**

■ It is clear that negotiation of order paper requires the authorized signature of the named payee. CL § 3–202(1)(2). Accordingly, in order to avoid liability, Citizens asserts that, because Mrs. Pagani was expressly authorized to endorse checks payable to MIFCO and deposit them in MIFCO's account, she was authorized to make the deposits into her personal account. We disagree.

In *Taylor v. Equitable Trust Co.*, 269 Md. 149, 156, 304 A.2d 838 (1973), the Court of Appeals noted that "the power to sign for another may be expressly given, or may be implied, or may rest on apparent authority: otherwise, the signature would be unauthorized under § 1–201(43)." Chief Judge Bond, speaking for the Court, in *Atlantic Trust Co. v. Subscribers, etc.*, 150 Md. 470, 475–76, 133 A. 319 (1926), stated:

> The controlling rule is that a principal can be bound by the acts of another as agent only so far as he, the principal, has empowered or permitted the other to represent him; and if the banker has been misled by an appearance of authority not known and acquiesced in by the principal, and so has accepted unauthorized endorsements, the banker is answerable for the loss.

In the instant case, it is uncontroverted that Mrs. Pagani's duties were to open MIFCO's mail, receive customer's checks, endorse the checks received with the address stamp and the "for deposit stamp", fill out MIFCO's deposit slip, deposit the checks into MIFCO's accounts at Citizens, and reconcile MIFCO's bank statement. Mrs. Pagani was further instructed to file a duplicate copy of the deposit slip with MIFCO's pink copies of the invoice. There is, however, absolutely no evi-

dence to indicate that Mrs. Pagani's authority extended to making deposits into her personal account. To the contrary, Mrs. Pagani specifically stated that she had not been given "permission to deposit any of MIFCO's checks into any other account than MIFCO's." This was corroborated by Ms. Alexander. Accordingly, we conclude that the uncontradicted evidence demonstrates that Mrs. Pagani's authority was limited to making deposits into the corporate account only.[11]

We further note that our decision is consistent with other jurisdictions that, either explicitly or implicitly, have concluded that an employee who had the authority to endorse checks for deposit into the employer's account was "unauthorized" to do so in other accounts. For example, in *Oswald*, 10 Cal.App.4th at 1238, 13 Cal.Rptr.2d 193, the defendant, a bookkeeper, opened two separate checking accounts in two banks with a name similar to that of his employer. He then obtained a deposit-endorsement stamp that he utilized to endorse the checks into the two accounts. After the defalcation was discovered, the employer brought suit against the two banks alleging conversion. The trial court granted summary judgment in favor of the banks because "there was no triable issue of material fact as to whether the endorsements stamped on the misappropriated checks were 'forgeries.'" *Id.* at 1243, 13 Cal.Rptr.2d 193. The appellate court reversed by first concluding that an unauthorized indorsement was actionable as a "forged endorsement" under the California equivalent of CL § 3–419. The Court then analyzed the defendant's scope of authority and concluded that summary judgment was improvidently granted since (1) the defendant "had no authority to open accounts" in the employer's name, (2) the defendant was "never authorized to obtain or use the endorsement stamps for those accounts", (3) the defendant's "authority with respect to the company's incoming checks was limited to endorsing them in the true name of the corporation" for deposit into the

---

11. In so holding, we necessarily conclude that there is no distinction between an unauthorized indorsement and a forgery. *See* 6A Anderson, *Uniform Commercial Code,* § 3–419:71, p 126–27 (1993).

employer's accounts. *Id.* at 1247, 13 Cal.Rptr.2d 193. *See also Confederate Welding,* 458 So.2d at 1374–75 (holding that the authority to endorse for deposit did not include authority to affix corporation's endorsement for purpose of depositing to president's personal account); *Grosberg v. Michigan Bank–Oakland,* 420 Mich. 707, 362 N.W.2d 715, 719 (1984) ("We accept as given the trial court's finding that Goldman had *actual* authority to [e]ndorse and deposit incoming checks only in the account maintained by Grosberg at Manufacturers National Bank, and not in the account opened by Goldman at defendant bank.") (Emphasis in the original).

### 2. *Expert Testimony*

■ MIFCO asserts that the court erred in imposing upon it the burden of proof under CL § 3–419. Specifically, MIFCO contends that "once a conversion has been established via an unauthorized indorsement it is [Citizens'] burden to establish that it acted in 'accordance with the reasonable commercial standards.' " *See Dominion Construction, Inc. v. First National Bank of Maryland,* 271 Md. 154, 166–67, 315 A.2d 69 (1974) (explaining when a bank has acted in accordance with reasonable commercial standards.) In this respect, we agree. CL § 3–419(3) delineates an affirmative defense available to a defendant-bank once the plaintiff has established that the "instrument is converted" under CL § 3–149(1)(c). In as much as the court erred in its decision on whether MIFCO had established conversion by Citizens, at the new trial, Citizens will have the burden of establishing that it dealt with the instrument "in good faith and in accordance with the reasonable commercial standards." CL § 3–419(3).

### 3. *Pre-judgment interest*

MIFCO also asserts that the court erred in not awarding prejudgment interest. Although that issue is not properly before us, there having been no judgment entered against Citizens, should the trial court find for MIFCO against Citizens, then legal interest should run to the date of the verdict.

*Abbott v. Forest Hill State Bank,* 60 Md.App. 447, 453–54, 483 A.2d 387 (1984).

JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR A NEW TRIAL. COSTS ASSESSED TO THE APPELLEE.